IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| DOMINGUEZ HURRY, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACT. NO. 3:21-cv-673-ECM |
| | ) | [WO] |
| GENERAL MOTORS LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION and ORDER

## I. INTRODUCTION

Plaintiffs Dominguez Hurry, Scott Goodwin, and Terry Wasdin (collectively, "Plaintiffs"), individually and behalf of all others similarly situated, bring this putative class action against Defendant General Motors LLC ("GM"), asserting claims arising out of problems the Plaintiffs experienced with the engines in their GM-manufactured vehicles. The Plaintiffs assert five claims under Alabama state law: violations of the Alabama Deceptive Trade Practices Act, ALA. CODE § 8-19-1 *et seq.* ("ADTPA") (Count 1); breach of express warranty pursuant to ALA. CODE §§ 7-2-313 and 7-2A-210 (Count 2); breach of the implied warranty of merchantability pursuant to ALA. CODE §§ 7-2-314 and 7-2A-212 (Count 3); fraudulent omission (Count 4); and unjust enrichment (Count 5). The Plaintiffs seek actual, statutory, and punitive damages; interest; attorney's fees; and costs. Additionally, the Plaintiffs seek injunctive relief on their ADTPA claims.

Now pending before the Court is GM's motion to dismiss the class action complaint. (Doc. 27). The motion is fully briefed and ripe for review. After careful

consideration, the Court finds that GM's motion is due to be granted in part and denied in part.

## II.  JURISDICTION AND VENUE

The Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1332.[1] Personal jurisdiction and venue are uncontested, and the Court concludes that venue properly lies in the Middle District of Alabama. *See* 28 U.S.C. § 1391.

## III.  LEGAL STANDARD

A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint against the legal standard set forth in Rule 8: "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "On a motion to dismiss, the court

---

[1] The Plaintiffs seek to invoke this Court's diversity jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d).  Plaintiff Goodwin is a Florida citizen, (doc. 1 at 8, para 25), and Plaintiffs Hurry and Wasdin are Alabama citizens, (*id.* at 9, para. 34; 10, para. 43).  Defendant General Motors LLC is a citizen of Delaware and Michigan. (*Id.* at 12, para. 51); *see Rolling Greens MHP, L.P. v. Comcast SCH Holdings L.L.C.*, 374 F.3d 1020, 1022 (11th Cir. 2004) (per curiam) (explaining that for purposes of diversity jurisdiction, a limited liability company is "a citizen of any state of which a member of the company is a citizen").  The Plaintiffs seek to represent the following class: "All current and former owners or lessees of a Class Vehicle (as defined herein) that was purchased or leased in the State of Alabama." (Doc. 1 at 64, para. 207).  The Complaint defines "Class Vehicle" to include the following 2011–2014 model year vehicles: Chevrolet Avalanche; Chevrolet Silverado; Chevrolet Suburban; Chevrolet Tahoe; GMC Sierra; GMC Yukon; and GMC Yukon XL. (*Id.* at 1–2, paras. 1–2).  The Plaintiffs assert that their proposed class comprises thousands of individuals. (*Id.* at 65, para. 210).  The Court concludes that the Plaintiffs have plausibly alleged that any plaintiff is a citizen of a different state from any defendant and that the proposed class contains 100 or more members. *See* 28 U.S.C. § 1332(d).  Additionally, the Plaintiffs allege that a piston assembly replacement, a (more) effective remedy for the alleged defect at issue, costs $2,700. (*Id.* at 62, para. 191).  Assuming 1000 class members and a 3:1 punitive damages award, the Plaintiffs have plausibly alleged that the amount in controversy exceeds $5 million: 1000 x $2,700 x 3 = $8.1 million. *See* 28 U.S.C. § 1332(d).  Thus, the Court may properly exercise diversity jurisdiction over this action.

must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor." *Bailey v. Wheeler*, 843 F.3d 473, 478 n.3 (11th Cir. 2016).

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted). The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678. Conclusory allegations that are merely "conceivable" and fail to rise "above the speculative level" are insufficient to meet the plausibility standard. *Twombly*, 550 U.S. at 555–56. This pleading standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (citation omitted). Indeed, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (citation omitted).

## IV.  FACTS[2]

### A.  Background Concerning the Alleged Defect and Prior Litigation

This putative class action arises out of an alleged engine defect present in certain vehicles sold by GM in Alabama and nationwide (the "Class Vehicles"). The Complaint defines "Class Vehicle" to include the following model year 2011–2014 vehicles:

---

[2] This recitation of the facts is based upon the Plaintiffs' complaint and GM's New Vehicle Limited Powertrain Warranty, which GM attached to its motion to dismiss. As the Court will explain, it may consider the document attached to GM's motion to dismiss because it is central to the Plaintiff's claim, and there is no dispute about the document's authenticity. The Court recites only the facts pertinent to resolving GM's motion (doc. 27). At this stage of the proceedings, for purposes of ruling on the motion, the facts alleged in the complaint and reasonable inferences drawn therefrom are set forth in the light most favorable to the Plaintiffs.

Chevrolet Avalanche; Chevrolet Silverado; Chevrolet Suburban; Chevrolet Tahoe; GMC Sierra; GMC Yukon; and GMC Yukon XL. (Doc. 1 at 1–2, paras. 1–2).  Class Vehicles are equipped with GM's Generation IV 5.3 Liter V8 Vortec 5300 LC9 Engines ("Generation IV Engines").  Generation IV Engines allegedly consume an abnormally high quantity of oil which "far exceeds industry standards for reasonable oil consumption." (*Id.* at 2, para. 5).  The Complaint refers to this alleged defect as the "Oil Consumption Defect."[3] The excessive oil consumption results in low oil levels, insufficient lubricity levels, oil fouling, and internal engine damage.  According to the Complaint, the primary cause of the Oil Consumption Defect is that the piston rings GM installed in the Generation IV Engines fail to keep oil in the crankcase.  The piston rings in the Class Vehicles are supposed to withstand over 100,000 miles of driving.  Nonetheless, for many drivers the piston rings deteriorate much sooner, requiring drivers to replenish their oil supply frequently.  Additionally, the Complaint alleges that the deterioration of the piston rings leads to engine damage, stalling, and power loss.  Other problems with the vehicles' Active Fuel Management system, the Oil Life Monitoring System, and the oil pressure gauge on the dashboard allegedly contribute to and exacerbate the Oil Consumption Defect.  The defect can cause drivability problems, including lack of power and engine seizure, which place the Plaintiffs and other class members at an increased risk of injury and death.

The Complaint alleges that GM knew about the Oil Consumption Defect as early as 2008.  By 2008, GM consumers had filed numerous complaints regarding excessive oil

---

[3] Because the Complaint refers to the alleged defect as the "Oil Consumption Defect," the Court will also do so in this opinion.  In doing so, the Court does not necessarily adopt this characterization.

consumption in earlier model-year vehicles equipped with Generation IV Engines. According to the Complaint, the consumer complaints "were so numerous that GM engineers started investigating the Oil Consumption Defect in at least 2008, and concluded the piston rings were prematurely failing and causing excessive oil consumption and internal engine wear." (Doc. 1 at 6, para. 19).  The Complaint further alleges that in May 2009, GM engineer Alan Miller "recognized that excessive oil consumption likely following from a defect in the piston rings." (*Id.* at 25, para. 114).  On June 8, 2009, before it sold the first Generation IV Engine powered Class Vehicle, GM "launched a 'Red X' investigation to determine the root cause of the oil consumption defect." (*Id.*, para. 115). On January 8, 2010, the "Red X" team produced an Executive Report regarding Generation IV Engine excessive oil consumption, in which GM states: "Oil consumption clearly follows the piston/ring assembly." (*Id.*, para. 116).  The Complaint also alleges that GM issued several Technical Service Bulletins ("TSBs") to its dealers addressing excessive oil consumption and its causes in vehicles with Generation IV Engines, further demonstrating GM's knowledge.  However, the TSBs also allegedly instructed dealers to make cheap "band-aid" or "stop-gap" repairs which did not actually cure the Oil Consumption Defect. Piston assembly replacement, a (more) effective remedy for the alleged defect, is more costly than the cheaper repairs GM allegedly pushed dealers to perform.  Additionally, GM eventually abandoned the Generation IV Engine for a redesigned Generation V 5.3 Liter V8 Vortec LC9 engine ("Generation V Engine").  Despite this knowledge, GM did not disclose the Oil Consumption Defect and continued to sell Class Vehicles with Generation IV Engines to consumers.

The Class Vehicles are covered by GM's New Vehicle Limited Powertrain Warranty ("Warranty").[4]  The Warranty provides coverage "for the first 5 years or 100,000 miles, whichever comes first." (Doc. 28-1 at 7).  This Warranty is "provided to the original and any subsequent owners of the vehicle during the warranty period," and the warranty period "begins on the date the vehicle is first delivered or put in use and ends at the expiration of the coverage period." (*Id.* at 9).  The Warranty "covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle related to materials or workmanship occurring during the warranty period." (*Id.*).  To obtain Warranty repairs, consumers are to "take the vehicle to a Chevrolet dealer facility within the warranty period and request the needed repairs.  Reasonable time must be allowed for the dealer to perform necessary repairs." (*Id.*).

On December 19, 2016, a putative nationwide class action was filed against GM in the United States District Court for the Northern District of California asserting claims arising out of the Oil Consumption Defect.  *See Siqueiros et al. v. General Motors LLC*,

---

[4] GM attaches a copy of the Warranty to its motion to dismiss, asserting that the Court may consider the Warranty when ruling on the motion because the Warranty is expressly referred to, and incorporated in, the Plaintiffs' Complaint.  The Court may consider a document attached to a motion to dismiss without converting the motion into one for summary judgment only if the document is (1) central to the Plaintiffs' claim, and (2) the authenticity of the document is not challenged.  *See Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002).  The Court agrees that the Warranty is central to the Plaintiffs' claim.  In their response in opposition to GM's motion to dismiss, the Plaintiffs do not challenge the authenticity of the Warranty or otherwise object to the Court considering the Warranty.  Accordingly, the Court concludes that it may consider the Warranty in ruling on GM's motion to dismiss.  *See id.* at 1135.

3:16-cv-7244-EMC (N.D. Cal.) ("*Siqueiros*").[5]   The named Alabama plaintiff asserted a breached of implied warranty claim under Alabama law on behalf of the Alabama Class, which the complaint defined as "[a]ll current and former owners or lessees of a Class Vehicle (as defined herein) that was purchased or leased in the State of Alabama." (Doc. 2 at 25 in *Siqueiros et al. v. General Motors LLC*, 3:16-cv-7244-EMC (N.D. Cal.)).   "Class Vehicles" included the following vehicles:  2010–2013 Chevrolet Avalanche; 2010–2012 Chevrolet Colorado; 2010–2013 Chevrolet Express 1500; 2010–2013 Chevrolet Silverado 1500; 2010–2013 Chevrolet Suburban; 2010–2013 Chevrolet Tahoe; 2010–2013 GMC Canyon; 2010–2013 GMC Savana 1500; 2010–2013 GMC Sierra 1500; 2010–2013 GMC Yukon; and 2010–2013 GMC Yukon XL. (Doc. 2 at 2 in *Siqueiros et al. v. General Motors LLC*, 3:16-cv-7244-EMC (N.D. Cal.)).   On August 26, 2020, the named Alabama plaintiff's claims were voluntarily dismissed without prejudice from *Siqueiros*. (Doc. 271 in *Siqueiros et al. v. General Motors LLC*, 3:16-cv-7244-EMC (N.D. Cal.)).[6]

---

[5] *Siqueiros* was originally styled *Sloan v. General Motors LLC*:  Sloan was the first named plaintiff listed in the caption and in the opening paragraph of the original complaint. (*See* doc. 2 in *Siqueiros et al. v. General Motors LLC*, 3:16-cv-7244-EMC (N.D. Cal.)).  Sloan sought to represent a subclass of owners and lessees of Class Vehicles which were purchased or leased in South Carolina.  Sloan's claims were voluntarily dismissed without prejudice on August 26, 2020. (Doc. 271 in *Siqueiros et al. v. General Motors LLC*, 3:16-cv-7244-EMC (N.D. Cal.)).  The Plaintiffs here sometimes refer to the action as *Siqueiros* and sometimes as *Sloan*.  In this opinion, the Court will do the same as context requires.

[6] Other named plaintiffs' claims were also voluntarily dismissed without prejudice.  For example, the named plaintiff Shorter, who brought claims under Florida law on behalf of a Florida Class, voluntarily dismissed their claims. (Docs. 2 & 271 in *Siqueiros et al. v. General Motors LLC*, 3:16-cv-7244-EMC (N.D. Cal.)).  Later, a putative class action was filed in the U.S. District Court for the Southern District of Georgia on behalf of "[a]ll current and former owners or lessees of a Class Vehicle (as defined herein) that was purchased or leased in the state of Florida." (Doc. 1 at 61 in *Hackler v. General Motors LLC*, 2:21-cv-19 (S.D. Ga.)).

### B. Plaintiffs Goodwin, Hurry, and Wasdin

On July 25, 2013, Plaintiff Goodwin purchased a new 2013 Chevrolet Silverado equipped with a Generation IV Engine and covered by the Warranty from Glynn Smith Chevrolet in Opelika, Alabama, with less than 100 miles on the odometer. Goodwin's vehicle consumes an unusually high volume of oil. He first noticed the excessive oil consumption in his vehicle at approximately 50,000 miles on the odometer. On two occasions, Goodwin's Silverado lost all oil pressure, requiring him to pull over to the side of the road. His engine has suffered "valvetrain tick" from low oil pressure since 52,000 miles on the odometer. (Doc. 1 at 8, para. 28). Goodwin has had Glynn Smith Chevrolet perform multiple oil monitoring tests, an oil consumption test, and a valve cover gasket replacement. He has also changed two spark plugs numerous times due to oil fouling. However, none of these measures have cured the excessive oil consumption problem on his Silverado. Prior to purchasing his Silverado, Goodwin spoke with a sales representative at Glynn Smith Chevrolet, saw commercials for the 2013 Chevrolet Silverado which promoted the truck's reliability and durability, and saw a Monroney sticker on the vehicle at the time of purchase. GM failed to disclose the Oil Consumption Defect to Goodwin through these avenues or any others. If GM had disclosed the Oil Consumption Defect, Goodwin would not have purchased the 2013 Silverado or would have paid less for it.

On April 17, 2017, Plaintiff Hurry purchased a used 2013 Chevrolet Silverado equipped with a Generation IV Engine and covered by the Warranty from Jack Ingram Value Lot in Montgomery, Alabama, with approximately 53,160 miles on the odometer. Hurry's vehicle consumes an unusually high volume of oil. He first noticed the excessive

oil consumption at around 54,000 miles on the odometer.  Hurry took his Silverado to Riverside Chevrolet in Wetumpka, Alabama, for an oil consumption test.  After performing the test, Riverside Chevrolet denied Hurry oil consumption repairs.  Hurry has taken his Chevrolet to other body shops for various repairs, but the repairs have not remedied his vehicle's excessive oil consumption, which he continues to experience to this day.  Prior to purchasing his Silverado, Hurry spoke with a sales representative at the Jack Ingram Value Lot and saw commercials for the 2013 Chevrolet Silverado which promoted the truck's reliability and durability.  GM failed to disclose the Oil Consumption Defect to Hurry through these avenues or any others.  If GM had disclosed the Oil Consumption Defect, Hurry would not have purchased the 2013 Silverado or would have paid less for it.

On February 11, 2013, Plaintiff Wasdin purchased a new 2012 Chevrolet Silverado equipped with a Generation IV Engine and covered by the Warranty from Chuck Stevens Chevrolet in Bay Minette, Alabama, with approximately twenty miles on the odometer. Wasdin's vehicle consumes an unusually high volume of oil.  Wasdin first noticed his Silverado was consuming excessive amounts oil at 70,465 miles on the odometer when the check engine light came on.  He then took the Silverado to Chuck Stevens Chevrolet, where he had valve covers and two spark plugs replaced.  However, these replacements did not cure the oil consumption problem.  At 93,547 miles on the odometer, Wasdin experienced misfiring and a knocking sound in his engine.  He again took his Silverado to Chuck Stevens Chevrolet.  According to the dealership, his Silverado had an oil-fouled plug and needed an engine replacement.  Wasdin paid out of pocket for an engine replacement.  Prior to purchasing his Silverado, Wasdin spoke with a sales representative at Chuck Stevens

Chevrolet and reviewed the Monroney sticker on the vehicle.  GM did not disclose the Oil Consumption Defect through these avenues or any others.  If GM had disclosed the Oil Consumption Defect, Wasdin would not have purchased the 2012 Silverado or would have paid less for it.

## V.  DISCUSSION

GM moves to dismiss the Complaint in its entirety, raising a bevy of arguments. The Court divides its discussion into five parts.  In Part A, the Court will address GM's arguments for dismissal of the express warranty claims.  In Part B, the Court will address GM's arguments for dismissal of the implied warranty claims.  In Part C, the Court will address GM's arguments for dismissal of the fraudulent omission claims.  In Part D, the Court will address GM's arguments for dismissal of the ADTPA claims.  Finally, in Part E, the Court will address GM's arguments for dismissal of the unjust enrichment claims.

### A.  Express Warranty

GM argues that the Plaintiffs' express warranty claims should be dismissed because the Warranty does not cover the Oil Consumption Defect, and even if it did, the Plaintiffs failed to present their vehicles for repair during the warranty period.  The Court will assume without deciding that the Warranty covers the Oil Consumption Defect and will proceed to address GM's second argument.

"An express warranty to repair anticipates that defects may occur and that, if detected during the term of the warranty, they will be remedied under the terms of the warranty." *Fowler v. Goodman Mfg. Co.*, 2014 WL 7048581, at *6 (N.D. Ala. Dec. 12, 2014).  "A manufacturer does not necessarily breach an express warranty to repair by

selling defective goods; rather, breach occurs if the manufacturer fails its promise to *remedy* defects *under the terms of the warranty.*" *Freeman v. NIBCO, Inc.*, 526 F. Supp. 3d 1112, 1130 (N.D. Ala. 2020) (emphases in original) (citing *Fowler*, 2014 WL 7048581, at *6). In *Freeman*, the court concluded that certain plaintiffs' express warranty claims failed because those plaintiffs "did not satisfy the condition that they send potentially defective products to [the defendant] for inspection"; thus, the defendant "could not possibly have breached the terms of the express warranty" with respect to those plaintiffs because the defendant's "duty to perform never arose." *Id.* (analyzing express warranty claims at the summary judgment stage).[7]   Additionally, another district court in this circuit, analyzing a complaint in a putative class action against GM based on the same Oil Consumption Defect, concluded that the plaintiff's express warranty claim under Florida law could not proceed because the plaintiff did not allege that he "sought or was denied repairs for any alleged defect during the warranty period," and Florida law normally requires a plaintiff "to allege and prove that [the defendant] refused or failed to adequately repair a covered item." *Hackler v. Gen. Motors LLC*, 2022 WL 270867, at *9 (S.D. Ga. Jan. 28, 2022) (alteration in original) (citation omitted).[8]

Here, to obtain Warranty repairs, consumers are to "take the vehicle to a Chevrolet dealer facility within the warranty period and request the needed repairs." (Doc. 28-1 at 9). Although the Plaintiffs allege that they took their vehicles in for repair, they do not allege

---

[7] Although the Court recognizes that *Freeman* is nonbinding, the Court finds its analysis persuasive.

[8] Although the Court recognizes that *Hackler* is nonbinding, the Court finds its analysis persuasive to the extent that Florida law is similar to Alabama law on this issue, and because *Hackler* analyzed the same alleged Oil Consumption Defect at issue in this case.

when they did so—*i.e.*, whether they did so within the warranty period.  The Plaintiffs do not argue in their response brief that they sought repairs during the warranty period. (Doc. 29 at 17).  Because the Plaintiffs do not allege that they "satisf[ied] the condition that they send potentially defective products to [GM] for inspection," GM had no "express duty to repair . . . those Plaintiffs' products." *See Freeman*, 526 F. Supp. 3d at 1130.  Thus, the Plaintiffs do not plausibly allege that GM breached the terms of the express warranty because GM's duty to perform never arose. *See id.*; *cf. Hackler*, 2022 WL 270867, at *9; *Heater v. General Motors LLC*, 568 F. Supp. 3d 626, 637–38 (N.D.W. Va. 2021) (concluding that plaintiff failed to plausibly allege an express warranty claim regarding the Oil Consumption Defect under West Virginia law where plaintiff acknowledged he did not seek repairs for the issue).

Nonetheless, the Plaintiffs argue that their failure to seek repairs during the warranty period does not defeat their express warranty claims because the Warranty fails of its essential purpose, thereby allowing them to recover UCC damages. *See* ALA. CODE § 7-2-719(2) ("Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this title.").  The Plaintiffs contend that the Warranty fails of its essential purpose because they could not have discovered the Oil Consumption Defect during the warranty period.  "In order to show that the warranty failed of its essential purpose, [the plaintiff] must show that the [warrantor] refused to repair . . . the engine in accordance with the warranty or that the [warrantor] did not repair the engine within a reasonable time." *Ex parte Miller*, 693 So. 2d 1372, 1377 (Ala. 1997) (alterations in original).  "The main point of this doctrine . . . is to prevent a warrantor from

limiting its customers solely to the remedy of repair after it has become obvious to reasonable persons that the warrantor cannot or will not repair the machine in compliance with the limited warranty." *Id.* at 1379 n.10; *accord McCollough Enters., LLC v. Marvin Windows & Doors*, 2010 WL 5014670, at *8 (S.D. Ala. Dec. 2, 2010) ("The idea behind this 'failure of essential purpose' doctrine is that a seller cannot limit the buyer to certain specified remedies, then conduct itself in a manner negating the efficacy of those remedies.").

The Plaintiffs' contention that they could not have discovered the Oil Consumption Defect during the warranty period does not show that the Warranty failed of its essential purpose because it does not show that GM failed to make repairs in accordance with the Warranty or that GM did not make repairs within a reasonable time.  Rather, it is a complaint that "the warranty period is too short." *See Hackler*, 2022 WL 270867, at *10 (reaching a similar conclusion regarding the plaintiff's express warranty claim under Florida law).  And the Plaintiffs do not allege that GM refused to repair their Class Vehicles in accordance with the Warranty—nor could they, since the Plaintiffs do not allege that they sought repairs during the warranty period.  The Plaintiffs also do not allege or argue that GM did not repair their vehicles within a reasonable time.  Consequently, the Plaintiffs have failed to demonstrate that GM's Warranty failed of its essential purpose. *See id.* (reaching a similar conclusion).

Because they do not allege that they sought repairs during the warranty period and have not demonstrated that GM's Warranty failed of its essential purpose, the Plaintiffs fail

to state plausible claims for breach of express warranty.  Accordingly, the express warranty claims are due to be dismissed.

## B.  Implied Warranty

The Court now turns to the Plaintiffs' implied warranty claims.  Under Alabama law, "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." ALA. CODE § 7-2-314(1).  To be merchantable, the goods must be "fit for the ordinary purposes for which such goods are used." *Id.* § 7-2-314(2)(c). The implied warranty of merchantability extends from the seller to the buyer. *Rhodes v. Gen. Motors Corp.*, 621 So. 2d 945, 947 (Ala. 1993).

GM contends that the Plaintiffs' implied warranty claims should be dismissed for three reasons: (1) the Plaintiffs lack privity with GM; (2) the Plaintiffs do not allege that the Class Vehicles were unmerchantable at the time of sale; and (3) the claims are time-barred.  In their response in opposition to GM's motion to dismiss, the Plaintiffs make responsive arguments regarding Goodwin and Wasdin, but not Hurry. (*See* doc. 29 at 18–22).  In its reply, GM argues that because the Plaintiffs did not make responsive arguments with respect to Hurry, Hurry has thus abandoned his implied warranty claim and concedes to its dismissal.  The Court agrees. *See Collins v. Davol, Inc.*, 56 F. Supp. 3d 1222, 1228 (N.D. Ala. 2014) (concluding, at the motion to dismiss stage, that the plaintiff's failure to respond to an argument that a claim should be dismissed constitutes abandonment of the

claim, and the claim was due to be dismissed "on those grounds alone").[9]  The Court will proceed to address the implied warranty claims with respect to Wasdin and Goodwin.

### 1. Privity

To bring an implied warranty of merchantability claim against a manufacturer for economic loss, the buyer must have privity of contract with the manufacturer. *Rhodes*, 621 So. 2d at 947.  The Plaintiffs argue that they satisfy the privity requirement because they were the intended beneficiaries of the implied warranty of merchantability between GM and the independent dealers, and thus they can bring implied warranty claims against GM as third-party beneficiaries.  In support, they cite an Alabama Supreme Court case which sets forth the elements a plaintiff must show to recover under a third-party beneficiary theory on a breach of contract claim: "1) that the contracting parties intended, at the time the contract was created, to bestow a direct benefit upon a third party; 2) that the [plaintiff] was the intended beneficiary of the contract; and 3) that the contract was breached." *Sheetz, Aiken & Aiken, Inc. v. Spann, Hall, Ritchie, Inc.*, 512 So. 2d 99, 101–02 (Ala. 1987).  The Eleventh Circuit, analyzing Alabama law, cited this portion of *Sheetz* in addressing whether a plaintiff had adequately alleged a claim for relief as a third-party beneficiary of an *express* warranty. *See Lisk v. Lumber One Wood Preserving, LLC*, 792 F.3d 1331, 1338 (11th Cir. 2015).  The Plaintiffs also cite *Naef v. Masonite Corp.*, where the district court concluded

---

[9] Although the Court recognizes that *Collins* is nonbinding, the Court finds its analysis persuasive.

that the plaintiffs could maintain their implied warranty of merchantability claims as third-party beneficiaries. 923 F. Supp. 1504, 1508 (S.D. Ala. 1996).[10]

In its reply, GM argues that Alabama law does not allow a third-party beneficiary to maintain an implied warranty of merchantability claim.  That is incorrect.  The Alabama Court of Civil Appeals has held that a third-party beneficiary can maintain a breach of implied warranty claim against the manufacturer or upstream seller. *Chandler v. Hunter*, 340 So. 2d 818, 822 (Ala. Civ. App. 1976); *Morris Concrete, Inc. v. Warrick*, 868 So. 2d 429, 435 (Ala. Civ. App. 2003).[11]  Citing one or both of these cases, Alabama federal district courts have echoed this principle. *See Harman v. Taurus Int'l Mfg.*, 2022 WL 479139, at *9 (M.D. Ala. Feb. 16, 2022) ("[A] third-party beneficiary to a contract between a manufacturer and seller can bring an implied warranty claim." (citing *Morris Concrete*, 868 So. 2d at 435)); *Freeman*, 526 F. Supp. 3d at 1132 ("Under Alabama law, third-party beneficiaries of a contract can stand in privity of contract with a seller and maintain a breach of implied warranty claim against the seller." (first citing *Morris Concrete*, 868 So. 2d at 435; then citing *Chandler*, 340 So. 2d at 822)); *Naef*, 923 F. Supp. at 1508 ("[T]he Court finds that a reasonable Alabama jurist could find that Plaintiffs were third party

---

[10] GM argues in its reply that *Naef* is inapposite because it did not involve an implied warranty of merchantability claim.  GM's argument is perplexing, given that *Naef* did involve an implied warranty of merchantability claim. *See Naef*, 923 F. Supp. at 1506 (stating that the plaintiffs' amended complaint contained a cause of action alleging "a breach of implied warranty of merchantability"); *id.* at 1508 (addressing the defendant's argument that the plaintiffs cannot bring a cause of action for breach of an implied warranty of merchantability and rejecting that argument based on *Chandler*).

[11] District courts sitting in diversity are "'bound' to follow an intermediate state appellate court 'unless there is persuasive evidence that the highest state court would rule otherwise.'" *Bravo v. United States*, 577 F.3d 1324, 1326 (11th Cir. 2009) (per curiam) (quoting *King v. Ord. of United Com. Travelers of Am.*, 333 U.S. 153, 158 (1948)).

beneficiaries to the contract between the Alabama dealers and the builders/contractors, and, under *Chandler*, Plaintiffs have a cause of action [for breach of implied warranty] against the Alabama dealers.").[12]

In addition to not acknowledging the cases allowing third-party beneficiaries to bring implied warranty claims under Alabama law, GM does not argue that the Plaintiffs do not meet the standard for third-party beneficiary claims articulated in *Sheetz* and *Lisk*. Construing the Complaint and all reasonable inferences in the Plaintiffs' favor, the Court concludes that the Plaintiffs have alleged sufficient facts to demonstrate, at this stage, that they are third-party beneficiaries of the implied warranty of merchantability and can maintain their implied warranty claims against GM.   An overview of *Freeman* is instructive.  In *Freeman*, twenty-four individuals and one business brought claims against the defendant manufacturer arising out of allegedly defective plumbing products which were installed in the plaintiffs' homes, including claims for breach of express warranty and breach of the implied warranty of merchantability. 526 F. Supp. 3d at 1116.  None of the plaintiffs purchased the products themselves; rather, their homebuilders contracted with the defendant for the products which the homebuilders installed in the houses, and the plaintiffs then purchased the houses. *Id.* at 1117.  The plaintiffs alleged that they experienced leaks in their pipes and resulting damage, including flooding, mold, and damage to the drywall, flooring, and cabinetry. *Id.*

---

[12] Neither of the cases GM cites in its reply held that a third-party beneficiary cannot bring a claim for breach of the implied warranty of merchantability, nor did they overrule or call into doubt *Chandler*. *See Johnson v. Anderson Ford, Inc.*, 686 So. 2d 224, 228 (Ala. 1996); *Rhodes*, 621 So. 2d at 947.

The defendant filed motions to dismiss and for partial summary judgment, arguing, as relevant here, that the express and implied warranty claims should be dismissed. *Id.* at 1128, 1131.  Although the court ultimately concluded that the express warranty claims were due to be dismissed for lack of evidence of breach, *id.* at 1130, the court first found that the plaintiffs were third-party beneficiaries of the express warranty, *id.* at 1129–30. Citing *Lisk*, the court explained that, to maintain a breach of express warranty claim under a third-party beneficiary theory, three elements must be shown: (1) "that the contracting parties intended, at the time the contract was created, to bestow a direct benefit upon a third party"; (2) "that the complainant was the intended beneficiary of the contract"; and (3) "that the contract was breached." *Id.* at 1129 (quoting *Lisk*, 792 F.3d at 1338).  The court then opined:

> The record construed in the light most favorable to the Plaintiffs supports a reasonable inference that the parties to the contract for [defendant's] products—[defendant] and the Plaintiffs' homebuilders—intended to bestow the benefit of the express warranty upon the Plaintiffs. According to the Eleventh Circuit applying Alabama law, "a 'court [may] look at the surrounding circumstances' in determining whether an end user is a third-party beneficiary. . . . One of the circumstances a court may consider is the foreseeability of harm to end users."  In this case, a reasonable jury could find that [defendant] and the Plaintiffs' homebuilders intended for the eventual occupants of the homes to benefit from the express warranty because of the foreseeability of harm to those occupants from defective plumbing.  After all, the homeowners—not the homebuilders—would use the plumbing for the 10- or 25-year warranty term and be the ones to suffer harm from any defects.

*Id.* at 1129–30 (third alteration in original) (quoting *Lisk*, 792 F.3d at 1338).  Relying on this reasoning, the court also concluded that the plaintiffs were third-party beneficiaries of

the implied warranty of merchantability and could maintain claims for breach of the implied warranty against the manufacturer. *Id.* at 1132.

Here, the Plaintiffs' Complaint supports a reasonable inference that the parties to the contract for the Class Vehicles—GM and the independent authorized dealers—intended to bestow the benefit of the implied warranty of merchantability upon the Plaintiffs. *See id.* at 1129.  It is reasonable to infer that GM and the independent dealers intended for the eventual users of the Class Vehicles—the Plaintiffs—to benefit from the implied warranty of merchantability because of the foreseeability of harm to those users from vehicles which are defective, unmerchantable, or both. *See id.*  Accordingly, the Court concludes that the Plaintiffs have alleged sufficient facts to allow them to maintain implied warranty claims as third-party beneficiaries.

### 2.  Unmerchantable at Time of Sale

GM also argues that the Plaintiffs have failed to allege that their vehicles were unmerchantable at the time of sale.  They contend that an "implied warranty is breached only where a vehicle is unfit to provide transportation," and that "[a] vehicle that provides transportation for years and thousands of miles is, as a matter of law, fit for its ordinary purpose of transportation, and cannot form the basis for a claim of breach of implied warranty." (Doc. 28 at 20).

GM's framing of this inquiry is too narrow.  Neither its cited authority nor common sense support the proposition that a vehicle is merchantable so long as it provides

transportation, regardless of any other problems with the vehicle.[13]   The Court finds *Easterling v. Ford Motor Co.*, 780 F. App'x 834, 838 (11th Cir. 2019) (per curiam), instructive, albeit nonbinding, on this point.   In *Easterling*, the Eleventh Circuit, interpreting Alabama law, held that there was sufficient evidence for a jury to conclude that the plaintiff's ten-year-old seatbelt "was not 'fit' for its ordinary intended use of passenger restraint" where the seatbelt had come undone in an accident, resulting in serious injuries. *Id.* at 838.   The plaintiff had owned the car for five years prior to the accident. *Id.* at 835.   The court explained that breach of the implied warranty occurs when goods "are *not* fit for the ordinary purposes for which they are used." *Id.* (emphasis in original).   The court further explained that Alabama cases "reveal that even if breach is assessed at the time of sale, the inquiry is forward-looking in nature," and "[j]ust as the District Court was required to account for the fact that the seatbelt was ten years old, it was required to analyze what a ten-year-old seatbelt should be able to withstand." *Id.* at 837.   The plaintiff produced evidence that one of the seatbelt's component parts was broken, such that the seatbelt did not properly latch into place. *Id.* at 837–38.   Moreover, the seatbelt "not only failed to notify [the plaintiff] that it was compromised; it misled him into thinking it was functioning

---

[13] In *DaimlerChrysler Corp. v. Morrow*, 895 So. 2d 861, 863–65 (Ala. 2004), the alleged problem—bucking and jerking—was only "intermittent" and, specifically, occurred only when the plaintiff's vehicle was being driven fifty-five miles per hour and pulling a specific forty-foot trailer.   In *Terrell v. R&A Manufacturing Partners*, 835 So. 2d 216, 229 (Ala. Civ. App. 2002), the court did not address any evidence that alleged defects with a subject trailer affected the plaintiff's ordinary use of the trailer.   Finally, in *Carlson v. General Motors Corp.*, 883 F.2d 287, 297 (4th Cir. 1989), which did not address claims under Alabama law, the Fourth Circuit affirmed the dismissal of implied warranty claims by plaintiffs whose vehicles had not experienced a defect and who relied solely on a theory of resale value.   However, the court reversed the dismissal of claims by plaintiffs whose vehicles experienced the alleged defect. *Id.* at 296.   The court also opined that the implied warranty of merchantability guarantees that vehicles will operate in a "safe condition" and "substantially free of defects." *Id.* at 297.

properly by providing a 'click.'" *Id.* at 838.  There was no evidence or argument that the plaintiff's car failed to provide transportation in the five years prior to the accident.

Although the primary issue in *Easterling* was whether the seatbelt's age precluded a determination that it was not fit for its ordinary purpose, *see id.*, the Court nonetheless finds *Easterling* persuasive and instructive in this case.  According to the Complaint, the piston rings in the Class Vehicles, which are supposed to withstand over 100,000 miles of driving, deteriorated much sooner, requiring drivers to replenish their oil supply frequently. Additionally, the Plaintiffs allege that the deterioration of the piston rings leads to engine damage, stalling, and power loss, and that the Generation IV Engines in their vehicles excessively consume oil beyond what GM expects and beyond industry standards, which can lead to drivability problems resulting in an increased risk of injury.  It is also alleged that, as a result of the Oil Consumption Defect, Goodwin was forced to pull over twice due to loss of oil pressure, and Wasdin was forced to pay for a new engine.  That the Class Vehicles "provided transportation" for years and thousands of miles is not dispositive as to whether a breach of the implied warranty of merchantability occurred.  Accepting the Complaint's allegations as true and drawing all reasonable inferences in the Plaintiffs' favor, the Plaintiffs have plausibly alleged that the Class Vehicles—specifically, the Generation IV Engines—were not fit for their ordinary purpose due to their alleged overconsumption of oil.

### 3.  Statute of Limitations

GM argues that the Plaintiffs' implied warranty claims are time-barred because the Plaintiffs filed this action after the expiration of the four-year statute of limitations

applicable to implied warranty claims.  The Plaintiffs counter that the limitations period

has been tolled by the class action tolling rule articulated in *American Pipe & Construction*

*Co. v. Utah*, 414 U.S. 538 (1974), as well as fraudulent concealment tolling.

GM bears the burden to establish the applicability of a statute of limitations

affirmative defense. *See Blue Cross & Blue Shield of Ala. v. Weitz*, 913 F.2d 1544, 1552

(11th Cir. 1990).  "[P]laintiff[s] [are] not required to negate a[] [statute of limitations]

affirmative defense in [their] complaint.'" *La Grasta v. First Union Sec., Inc.*, 358 F.3d

840, 845 (11th Cir. 2004) (second, third, and sixth alterations in original) (citation omitted).

"[A] Rule 12(b)(6) dismissal on statute of limitations grounds is appropriate only if it is

'apparent from the face of the complaint' that the claim is time-barred." *Id.* (citation

omitted).  Where "the dates alleged in the complaint make it clear that the statute of

limitations bars [the plaintiff's] claims," the plaintiff must "allege[] facts supporting tolling

of the statute of limitations" in order to avoid the limitations bar. *See Patel v. Diplomat*

*1419VA Hotels, LLC*, 605 F. App'x 965, 966 (11th Cir. 2015) (per curiam).

### a.  Fraudulent Concealment Tolling

Section 6-2-3 of the Alabama Code states:

> In actions seeking relief on the ground of fraud where the statute has created
> a bar, the claim must not be considered as having accrued until the discovery
> by the aggrieved party of the fact constituting the fraud, after which he must
> have two years within which to prosecute his action.

The Alabama Supreme Court "has held that § 6-2-3 applies not only to fraud claims, but

also 'to the fraudulent concealment of the existence of a cause of action.'" *Ladd v.*

*Stockham*, 209 So. 3d 457, 468 (Ala. 2016) (quoting *DGB, LLC v. Hinds*, 55 So. 3d 218,

225–26 (Ala. 2010)).  Alabama "recognize[s] that a *fraudulent concealment* by a defendant tolls the running of the statute until the tort or injury is discovered or could have been discovered by due diligence." *Id.* (emphasis in original) (citation omitted).  To toll the limitations period for a cause of action due to fraudulent concealment, the plaintiff "must allege (1) 'the time and circumstances of the discovery of the cause of action,' (2) 'the facts or circumstances by which the defendants concealed the cause of action or injury,' and (3) 'what prevented the plaintiff from discovering the facts surrounding the injury.'" *Sellew v. Terminix Int'l Co.*, 2018 WL 2670050, at *4 (N.D. Ala. June 4, 2018) (quoting *DGB*, 55 So. 3d at 226).  The question of when a plaintiff discovered or should have discovered fraud is normally a jury question. *Wheeler v. George*, 39 So. 3d 1061, 1082 (Ala. 2009).  It can be decided as a matter of law only if the plaintiff actually knew of facts that would have put a reasonable person on notice of fraud. *Ex parte Ala. Farmers Co-op., Inc.*, 911 So. 2d 696, 703 (Ala. 2004).

In *DGB*, the Alabama Supreme Court concluded that the plaintiffs sufficiently alleged the time and circumstances of their discovery when they alleged that they discovered the causes of action during depositions in separate litigation. 55 So. 3d at 227. The court also concluded that the plaintiffs sufficiently alleged the facts regarding concealment because they had alleged that the defendants knew about misuse of funds and the purchase of a property for half of its sale price a few days before the transaction at issue, but concealed those facts during the transaction. *Id.*  Finally, the court concluded that the plaintiffs sufficiently alleged the circumstances that prevented them from discovering the fraud because they alleged that the defendants controlled the relevant information and

the plaintiffs did not access to such information, the plaintiffs entrusted the negotiation and execution of the transaction to others, and the plaintiffs relied on the defendants' representations about the sale price instead of examining the relevant property records. *Id.* at 227–28.  Citing *DGB*, the district court in *Sellew* concluded that the plaintiff sufficiently alleged fraudulent concealment tolling where she alleged that the defendants concealed the causes of action by failing to disclose the deficiencies in their pest control treatment, misrepresenting the nature of their 1995 pest control treatment in 2002 and again in 2013, performing inadequate yearly inspections, and performing an insufficient inspection in 2016. *Sellew*, 2018 WL 2670050, at *5.[14]  The plaintiff also alleged that she failed to discover the defendants' deficient pest control treatment "because she relied on their expertise, she lacked the expertise to determine whether Defendants had properly treated [her home], and Defendants misrepresented the nature of their earlier treatment when she discovered a terminate infestation in 2013." *Id.*

Here, the Plaintiffs sufficiently allege the time and circumstances of their discovery of the fraud because they allege that did not know, nor could have known, about the Oil Consumption Defect afflicting the Generation IV Engines in their Class Vehicles "until after Plaintiffs' counsel's investigation led to the filing of the *Siqueiros* Action on December 19, 2016." (Doc. 1 at 62, para. 194).  Additionally, the Plaintiffs allege that GM concealed the cause of action by failing to disclose vital information about the Oil Consumption Defect, such that neither the Plaintiffs nor the other class members could

---

[14] While the Court recognizes that *Sellew* is nonbinding, the Court finds its analysis persuasive.

have discovered the defect, and by issuing the TSBs which instructed dealers to offer repairs that GM knew would not cure the Oil Consumption Defect. The Plaintiffs also allege that they and the other class members "justifiably relied on GM to disclose the Oil Consumption Defect in the Class Vehicles they purchased or leased, because that defect was hidden and not discoverable through reasonable efforts." (*Id.* at 63, para. 200). This allegation permits the reasonable inference that the Plaintiffs relied on GM's expertise and superior knowledge, and it sufficiently alleges what prevented the Plaintiffs from discovering the facts. Construing the Complaint and all reasonable inferences in the Plaintiffs' favor, the Court concludes that the Complaint alleges sufficient facts to support the Plaintiffs' argument for fraudulent concealment tolling. *See DBG*, 55 So. 3d at 227–28; *Sellew*, 2018 WL 2670050, at *5.

### b. Class Action Tolling

The Plaintiffs also argue that their implied warranty claims were tolled from December 19, 2016 until August 26, 2020, under *American Pipe* tolling. In *American Pipe*, the United States Supreme Court held that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." 414 U.S. at 554.[15] The Plaintiffs allege that their claims were tolled by the filing of the *Siqueiros* action. According to the Complaint, the Plaintiffs were part of the Alabama Class in the original

---

[15] While *American Pipe* involved putative class members who sought to intervene after class certification was denied, the Supreme Court expressly extended *American Pipe*'s holding to putative class members who later file separate actions. *See Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 353–54 (1983).

complaint filed on December 19, 2016 in *Sloan* (the predecessor to *Siqueiros*), and the named Alabama plaintiff asserted a breached of implied warranty claim under Alabama law. The named Alabama plaintiff's claims were dismissed from *Sloan*/*Siqueiros*, without an adjudication on the merits, on August 26, 2020. The Plaintiffs filed their Complaint in this Court on October 8, 2021—one year, one month, and twelve days after the named Alabama plaintiff's claims were dismissed from *Sloan*/*Siqueiros*, which is within the two-year limitations period set out in § 6-2-3. The Court concludes that the Complaint alleges sufficient facts to support the Plaintiffs' argument for class action tolling.

GM counters that "Alabama does not recognize cross-jurisdictional class action tolling," citing *Bozeman v. Lucent Technologies, Inc.*, 2005 WL 2145911, at *3 (M.D. Ala. Aug. 31, 2005). In *Bozeman*, the plaintiffs argued that the limitations period for their *state* securities law claims should be tolled due to an earlier federal class action which asserted a *federal* securities law claim. *Id.* at *2–3. The court in *Bozeman* concluded that the plaintiffs' state law claims were filed beyond the applicable limitations period in light of the lack of binding authority "for the proposition that their state law claims [were] tolled due to an earlier federal class action alleging a federal claim." *Id.* at *3. *Bozeman* observed that the Alabama Supreme Court has held that a class action filed in state court tolls the limitations period for putative class members who later file a separate action in state court, but noted that it is a different question whether Alabama would allowing tolling based upon an earlier-filed class action in another jurisdiction in federal court. *See id.* (first citing *First Baptist Church of Citronelle v. Citronelle-Mobile Gathering, Inc.*, 409 So. 2d 727, 730 (Ala. 1981); then citing *Wade v. Danek Med., Inc.*, 182 F.3d 281, 287 (4th Cir. 1999)).

However, contrary to GM's assertion, *Bozeman* did not conclude that Alabama does not recognize "cross-jurisdictional" class action tolling.

GM makes no other argument or citation to authority regarding the applicability of *American Pipe* tolling here. Given the early stage of the litigation and GM's cursory treatment of *American Pipe* tolling in its briefing, the Court concludes that GM has failed to demonstrate, at this stage, that the statute of limitations bars the Plaintiffs' implied warranty claims. *See Weitz*, 913 F.2d at 1552.

Accordingly, GM's motion to dismiss Hurry's implied warranty claim is due to granted, and GM's motion to dismiss Goodwin's and Wasdin's implied warranty claims is due to be denied.

### C. Fraudulent Omission/Suppression

The Court now turns to the Plaintiffs' fraudulent omission claim. Although labeled "fraudulent omission" in the Complaint, the parties cite caselaw dealing with claims of fraudulent suppression or concealment under Alabama law. The Court could not locate Alabama authority recognizing a claim for fraudulent omission distinct from a claim of fraudulent suppression or concealment.[16] Accordingly, when discussing the Plaintiffs' fraudulent omission claim, the Court will refer to it as "fraudulent suppression."

A claim of fraudulent suppression is governed by ALA. CODE § 6-5-102, which states: "Suppression of a material fact which the party is under an obligation to

---

[16] At least one jurisdiction treats fraudulent omission claims as distinct from fraudulent suppression claims. *See, e.g.*, *Heater*, 568 F. Supp. 3d at 640 (discussing fraudulent omission and fraudulent concealment as distinct claims with different elements under West Virginia law).

communicate constitutes fraud.  The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case."  The elements of a claim of fraudulent suppression are: (1) the defendant had a duty to disclose a material fact; (2) the defendant had actual knowledge of the fact; (3) the defendant suppressed the material fact; (4) the defendant's suppression of the fact induced the plaintiff to act or to refrain from acting; and (5) the plaintiff was damaged as a result of the suppression. *See Waddell & Reed, Inc. v. United Investors Life Ins. Co.*, 875 So. 2d 1143, 1161 (Ala. 2003).  "Although the term 'inducement' has often been used in the description of the fourth element of suppression, it is clear that a plaintiff's ['reasonable reliance'] is an essential element of a suppression claim." *Johnson v. Sorensen*, 914 So. 2d 830, 837 (Ala. 2005) (alteration in original).  Moreover, Rule 9(b) requires the Plaintiffs to state with particularity "the circumstances constituting fraud." FED. R. CIV. P. 9(b).

GM argues that the fraudulent suppression claim is due to be dismissed because: (1) the Plaintiffs do not plead fraud with particularity as required by Rule 9(b); (2) the Plaintiffs do not allege that GM knew about the defect at the time of sale; and (3) the Plaintiffs do not allege that GM had a duty to disclose.  The Court will address each argument.

### 1.  Compliance with Rule 9(b)

Rule 9(b) may be satisfied if the complaint sets forth:

(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the

manner in which they misled the plaintiff, and (4) what the "defendants obtained as a consequence of the fraud."

*Brooks v. Blue Cross & Blue Shield of Fla.*, 116 F.3d 1364, 1371 (11th Cir. 1997) (per curiam) (citation omitted); *accord Zuanich v. Hankook Tire Am. Corp.*, 2018 WL 6709466, at *5 (M.D. Ala. Dec. 20, 2018). "However, 'alternative means are also available to satisfy the rule.'" *Brooks*, 116 F.3d at 1371 (citation omitted). Rule 9(b) "serves an important purpose in fraud actions by alerting defendants to the 'precise misconduct with which they are charged' and protecting defendants 'against spurious charges of immoral and fraudulent behavior.'" *Id.* at 1370–71 (citation omitted).

Here, the Plaintiffs allege that GM sold Class Vehicles which suffer from the Oil Consumption Defect. The Plaintiffs further allege that GM knew of the Oil Consumption Defect but failed to disclose it at any time prior to the Plaintiffs' purchasing their Class Vehicles. The Plaintiffs further allege that, despite knowing of the defect, GM concealed and omitted material information regarding the nature of the Oil Consumption Defect in every communication it had with the Plaintiffs and other class members. In particular, the Complaint alleges that Goodwin spoke to a sales representative at a GM dealership, saw commercials promoting the truck's reliability and durability, and saw a Monroney sticker on the truck at time of purchase, but GM did not disclose the Oil Consumption Defect through these avenues or any others; Hurry spoke to a sales representative at a GM dealership and saw commercials promoting the truck's reliability and durability, but GM did not disclose the Oil Consumption Defect through these avenues or any others; and Wasdin spoke to a sales representative at a GM dealership and reviewed a Monroney

sticker on the truck at time of purchase, but GM did not disclose the Oil Consumption Defect through these avenues or any others.  The Plaintiffs further allege that, had they known of the defect, they would not have purchased their vehicles or would have paid less for them.  Moreover, the Plaintiffs sufficiently allege what GM obtained as a result of the fraud because they allege that GM never disclosed the Oil Consumption Defect for the purpose of inducing Plaintiffs and other class members to purchase or lease Class Vehicles. Another district court in this circuit has concluded that substantially similar allegations satisfy Rule 9(b)'s particularity requirements, which the Court finds persuasive. *See Hackler*, 2022 WL 270867, at *6.  The Court finds that the Complaint alleges the "circumstances constituting fraud" with sufficient particularity, *see* FED. R. CIV. P. 9(b), and adequately alerts GM to the precise misconduct with which it is charged, *see Brooks*, 116 F.3d at 1370.  Accordingly, dismissal is not warranted for failure to comply with Rule 9(b).

GM also contends that the Plaintiffs fail to allege facts establishing reliance on any alleged GM omission or to support a causal connection between any alleged GM omission and any claimed injury.  This contention ignores the Plaintiffs' allegations that, prior to purchasing their Class Vehicles, they spoke with sales representatives, saw commercials that promoted the vehicles' reliability and durability, and reviewed Monroney stickers on the vehicles; that GM never disclosed the Oil Consumption Defect; that the Plaintiffs and Class Members relied on GM to disclose the Oil Consumption Defect because the defect was hidden and not discoverable through reasonable efforts; and that the Plaintiffs would not have purchased their Class Vehicles or would have paid less for them if the Plaintiffs

had known about the Oil Consumption Defect.  The Court finds that the Complaint sufficiently alleges reliance and causation,[17] and dismissal is not warranted on those grounds.

### 2. GM's Knowledge of the Defect

The Court now turns to GM's arguments that the Complaint fails to adequately allege GM's pre-sale knowledge of the Oil Consumption Defect.  Rule 9(b) provides that knowledge "may be alleged generally."  Here, the Complaint alleges that consumer complaints about excessive oil consumption "were so numerous that GM engineers started investigating the Oil Consumption Defect in at least 2008, and concluded the piston rings were prematurely failing and causing excessive oil consumption and internal engine wear." (Doc. 1 at 6, para. 19).  Moreover, in May 2009, GM engineer Alan Miller "recognized that excessive oil consumption likely following from a defect in the piston rings." (*Id.* at

---

[17] GM cites *Shedd v. Wells Fargo Home Mortgage*, 2015 WL 6479537 (S.D. Ala. Oct. 26, 2015), in support of its argument that the Plaintiffs fail to adequately allege reliance.  The Court finds *Shedd* inapposite.  The portion of *Shedd* to which GM cites contains the court's analysis of the plaintiffs' fraudulent misrepresentation claim, not the fraudulent suppression claim. *See id.* at *7.  The court concluded that the fraudulent *suppression* claim failed due to a lack of duty to disclose. *Id.* at *8 ("Plaintiffs' fraudulent suppression claim fails for a different reason, that is, a party cannot be held liable for suppressing information it had no duty to disclose.").  For the reasons discussed later in this opinion, the Court concludes that the Plaintiffs here have sufficiently alleged that GM had a duty to disclose.  Moreover, regarding the fraudulent misrepresentation claim, the *Shedd* court explained that the plaintiffs' only assertion regarding their reliance on defendant Wells Fargo's alleged misrepresentations was: "Wells Fargo intended that Plaintiffs rely on the above false statements, which they reasonably did to their detriment*, in continuing to make monthly payments to Wells Fargo*[.]" *Id.* at *7 (alteration in original) (emphasis in original). Observing that "[a] representation in an arm's length transaction that causes a person to do nothing more than he was legally obligated to do without such a representation being made, is not material and therefore cannot constitute actionable fraud," the court concluded that the plaintiffs' allegation was insufficient to support recovery for fraud because the monthly payments were required by a promissory note and the plaintiffs' Chapter 11 bankruptcy plan. *Id.* (quoting *Reeves v. Porter*, 521 So. 2d 963, 967 (Ala. 1988)).  It appears to the Court that the fraudulent misrepresentation claim in *Shedd* failed due to lack of materiality, not lack of reliance.  And GM does not argue here that its alleged omissions were not material.  In any event, *Shedd*'s facts are not the facts alleged in this Complaint, and there is no suggestion that the Plaintiffs were legally obligated to buy or lease their Class Vehicles.

25, para. 114).  On June 8, 2009, before it sold the first Generation IV Engine powered Class Vehicle, GM launched a root cause investigation into the Oil Consumption Defect. On January 8, 2010, the investigation produced a report regarding Generation IV Engine excessive oil consumption, which states: "Oil consumption clearly follows the piston/ring assembly." (*Id.*, para. 116).  The district court in *Sloan*, considering these facts at the summary judgment stage, found that a reasonable juror could conclude that GM knew about the Oil Consumption Defect and actively concealed it. *Sloan*, 2020 WL 1955643, at *13–16.

The Plaintiffs additionally allege that GM knew about the Oil Consumption Defect based upon: (1) GM's first Oil Consumption Defect-related TSB, which GM implemented before the Plaintiffs purchased their Class Vehicles in 2013 and 2017; (2) GM's design changes in the Generation IV Engine, which GM made before the Plaintiffs purchased their Class Vehicles in 2013 and 2017; and (3) dozens of consumer complaints about oil consumption issues in the relevant engines predating the Plaintiffs' purchases of their Class Vehicles.

GM contends that allegations of subsequent design changes, consumer complaints, and TSBs do not establish GM's knowledge.  Assuming without deciding that GM is correct, those are not the only allegations upon which the Plaintiffs rely to establish knowledge.  GM also contends that the Plaintiffs only allege "generally" that GM has long known about the Oil Consumption Defect without providing sufficient factual detail.  The Court disagrees.  As set forth above, the Plaintiffs allege, among others, that before GM sold its first Generation IV Engine powered Class Vehicle, GM had its engineers

investigate the Oil Consumption Defect, and those investigations produced the engineers'

conclusions that defective piston rings were causing excessive oil consumption and engine

wear. Viewing the Complaint as a whole, the Plaintiffs have plausibly alleged that GM

had pre-sale knowledge of the Oil Consumption Defect. *See Sloan*, 2020 WL 1955643, at

*13–16; *Heater*, 568 F. Supp. 3d at 642 (reaching a similar conclusion regarding the

plaintiff's fraudulent omission claim under West Virginia law concerning the same alleged

Oil Consumption Defect).

### 3. GM's Duty to Disclose

The Court now considers GM's argument that the Plaintiffs' fraudulent omission

claim fails because they do not allege that GM had a duty to disclose. Alabama Supreme

Court precedent "makes it very clear that in an action alleging suppression of a material

fact, a duty to disclose may be owed to a person with whom one has not had a contractual

relationship or other dealings." *Hines v. Riverside Chevrolet-Olds, Inc.*, 655 So. 2d 909,

919 (Ala. 1994), *overruled in part on other grounds by State Farm Fire & Cas. Co. v.*

*Owen*, 729 So. 2d 834 (Ala. 1998). Moreover, Alabama recognizes a duty to disclose

material facts "to those members of a group or class that the defendant has special reason

to expect to be influenced by the representation." *Id.* at 920 (citation omitted); *see also*

*Carter v. Chrysler Corp.*, 743 So. 2d 456, 462 (Ala. Civ. App. 1998) ("[U]nder *Hines*, we

note that neither the absence of a direct contractual relationship between Chrysler and the

Carters, nor Chrysler's distance from the transaction in which the Carters bought their

truck, necessarily relieves Chrysler from a duty to disclose."). Courts consider the

following factors in determining whether the defendant had a duty to disclose: "(1) the

relationship of the parties; (2) the relative knowledge of the parties; (3) the value of the particular fact; (4) the plaintiff's opportunity to ascertain the fact; (5) the customs of the trade; and (6) other relevant circumstances." *Owen*, 729 So. 2d at 842–43. "A duty to disclose may be found to exist when one person has superior knowledge of a material fact and the failure to disclose that fact would induce another person to take an action he or she would not take if they knew that fact." *Hines*, 655 So. 2d at 921. Whether the defendant had a duty to disclose is a question of law. *Owen*, 729 So. 2d at 839 (overruling earlier precedent, including *Hines*, which held that the existence of a duty to disclose is a question of fact).

Here, for the reasons explained above in Part V.C.2, the Plaintiffs plausibly allege that GM knew about the Oil Consumption Defect before they purchased their Class Vehicles. The Plaintiffs also allege that GM advertised the Class Vehicles as reliable and durable in commercials, statements by sales representatives at GM dealerships, and Monroney stickers on the vehicles, while failing to disclose and actively concealing the Oil Consumption Defect from the Plaintiffs and class members by, for example, issuing TSBs and instructing dealers to make cheaper "band-aid" or "stop-gap" repairs which did not actually cure the defect. The Plaintiffs further allege that they and the other class members relied on GM to disclose the Oil Consumption Defect because the defect was hidden and not discoverable through reasonable efforts, which permits the reasonable inference that GM had superior knowledge of the facts compared to the Plaintiffs. The Plaintiffs also allege that if they had known about the Oil Consumption Defect, they would not have purchased their Class Vehicles or would have paid less for them.

Taken as a whole, the Complaint permits the reasonable inference that the Plaintiffs, as ultimate purchasers and users of the Class Vehicles, were "members of a group or class of persons who General Motors expected or had special reason to expect would be influenced by its decision not to disclose information about [the Oil Consumption Defect]," and, consequently, that GM and the Plaintiffs have "a sufficient relationship on which to base a duty to disclose." *See Hines*, 655 So. 2d at 920 (reaching this conclusion regarding the plaintiffs' fraudulent suppression claim concerning GM's alleged failure to disclose information about the repainting of damaged automobiles). And considering, as alleged in the Complaint, the parties' relationship, the value of the facts allegedly suppressed, GM's superior knowledge of the facts, and the Plaintiffs' limited opportunity to discover the facts, the Plaintiffs have plausibly alleged that GM had a duty to disclose the Oil Consumption Defect. *See In re Gen. Motors Air Conditioning Mktg. & Sales Pracs. Litig.*, 406 F. Supp. 3d 618, 638 (E.D. Mich. 2019) (concluding that plaintiffs plausibly alleged facts supporting a duty to disclose under Alabama law where plaintiffs alleged that GM knew about the alleged air-conditioning defect before plaintiffs bought their vehicles; GM willfully failed to disclose the defect; the facts were material to plaintiffs; plaintiffs were not able to reasonably discover the defect on their own; and GM made repeated statements about the Class Vehicles' safety and quality through marketing campaigns, statements by GM's sales representatives, and representations on Class Vehicle window stickers); *In re Takata Airbag Prod. Liab. Litig.*, 193 F. Supp. 3d 1324, 1337–38 (S.D. Fla. 2016) (concluding that plaintiff plausibly alleged that Mazda had a duty to disclose under Alabama law where plaintiffs alleged that Mazda made "incomplete representations about the safety and

reliability of the Class Vehicles, while purposefully withholding material facts from Plaintiffs [regarding an alleged Inflator Defect] that contradicted these representations"; the alleged incomplete representations included statements in Mazda's brochures that its car possessed "inspiring performance" and "reassuring safety features," and statements on Mazda's website that "in every configuration, you'll enjoy Mazda's legendary performance, function, style and safety"); *cf. Heater*, 568 F. Supp. 3d at 641–42 (concluding that plaintiff plausibly alleged that GM had a duty to disclose the Oil Consumption Defect under West Virginia law based upon similar factual allegations; West Virginia law imposes upon a seller "a duty to disclose a defect in property where it is aware of a defect affecting the value of the property and the purchaser would not have discovered it by a reasonably diligent inspection"); *Hines*, 655 So. 2d at 921 (at summary judgment, concluding that plaintiffs had produced sufficient evidence that GM had a duty to disclose information about the repainting of damaged automobiles).

Accordingly, the Court concludes that GM's motion to dismiss the fraudulent omission claim is due to be denied.

### D. ADTPA

The ADTPA prohibits sellers from engaging in a variety of acts and practices, including "any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." ALA. CODE § 8-19-5(27). "A plaintiff may allege an ADTPA claim based on 'concealment, suppression, or omission,' so long as he or she can demonstrate 'some knowledge of false or deceptive conduct on the part of the wrongdoer.'"

*Devane v. L'Oreal USA, Inc.*, 2020 WL 5518484, at *3 (S.D.N.Y. Sept. 14, 2020) (citation omitted).

GM argues that the Plaintiffs' ADTPA claims are due to be dismissed because (1) the Plaintiffs waived their right to pursue the claims; (2) the claims are barred by the statute of limitations; (3) the Plaintiffs fail to allege deceptive conduct and causation; and (4) the Plaintiffs fail to allege GM's knowledge.  GM also argues that the Plaintiffs lack standing to pursue their request for injunctive relief.  The Court will begin, and ultimately end, with GM's statute of limitations argument.

GM argues that the Plaintiffs' ADTPA claims are time-barred because they were not filed within one year of the expiration of their vehicles' warranties, citing ALA. CODE § 8-19-14.  The Plaintiffs respond that their claims are not time-barred based on the discovery rule in that section.

Section 8-19-14 provides:

No action may be brought under this chapter more than one year after the person bringing the action discovers or reasonably should have discovered the act or practice which is the subject of the action, but in no event may any action be brought under this chapter more than four years from the date of the transaction giving rise to the cause of action unless the contract or warranty is for more than three years.  If the contract or warranty is for more than three years, no action may be brought more than one year from the expiration date of the contract or warranty or more than one year after the person bringing the action discovered or reasonably should have discovered the act or practice which is the subject of the action, whichever occurs first.

According to the Complaint, Goodwin bought his Class Vehicle new on July 25, 2013; Wasdin bought his Class Vehicle new on February 11, 2013; and Hurry bought his Class Vehicle used (a 2013 Chevrolet Silverado) on April 17, 2017.  The Warranty provides

coverage "for the first 5 years or 100,000 miles, whichever comes first." (Doc. 28-1 at 7). This warranty is "provided to the original and any subsequent owners of the vehicle during the warranty period," and the warranty period "begins on the date the vehicle is first delivered or put in use and ends at the expiration of the coverage period." (*Id.* at 9). GM contends that the Plaintiffs' warranties expired no later than 2018 and, consequently, their ADTPA claims had to be filed no later than 2019—one year after the warranties expired. GM further contends that, because the Plaintiffs did not file this action until October 2021, which is more than one year after the warranties expired, the statute of limitations bars the ADTPA claims.

As GM points out in its reply, the Plaintiffs do not dispute in their response that their warranties expired no later than 2018, nor do the Plaintiffs respond to GM's argument that they filed their ADTPA claims more than one year after their warranties expired. (Doc. 29 at 33). Rather, they argue that the date on which they should have discovered GM's alleged fraud "is a fact-intensive question and ill-suited for resolution at the pleading stage." (*Id.*). The problem with the Plaintiffs' reliance on the discovery rule in § 8-19-14 is that it ignores the remainder of the sentence, which may operate to limit the availability of the discovery rule. If, as here, the warranty is for more than three years, "no action may be brought more than one year from the expiration date of the . . . warranty or more than one year after the [plaintiff] discovered or reasonably should have discovered the act or practice which is the subject of the action, *whichever occurs first*." *Id.* (emphasis added). Thus, even assuming the Plaintiffs did not discover the defect until well after the warranties expired, by operation of § 8-19-14 the ADTPA claims are time barred if not filed within

one year of the warranties' expiration.  Because the Plaintiffs do not dispute that their warranties expired no later than 2018 or otherwise respond to GM's argument that the ADTPA claims were filed more than one year after the warranties expired, the Court concludes that the Plaintiffs have conceded this point. *Cf. Collins*, 56 F. Supp. 3d at 1228. Consequently, based on GM's arguments to which the Plaintiffs failed to respond, the Court concludes GM has demonstrated that the statute of limitations bars the Plaintiffs' ADTPA claims.  Accordingly, GM's motion to dismiss the ADTPA claims is due to be granted.  Because the Court concludes that the ADTPA claims are time-barred, the Court pretermits discussion of GM's remaining arguments for dismissal of these claims.

### E.  Unjust Enrichment

Finally, GM argues that the Plaintiffs' unjust enrichment claims should be dismissed because an unjust enrichment claim cannot be maintained where there is an express contract and because the Plaintiffs have adequate legal remedies.  The Plaintiffs counter that the Federal Rules of Civil Procedure permit pleading alternative and inconsistent theories of liability and thus dismissal on the grounds urged by GM is not warranted.

"It is a well-settled rule of federal procedure that plaintiffs may assert alternative and contradictory theories of liability." *Adinolfe v. United Techs. Corp.*, 768 F.3d 1161, 1175 (11th Cir. 2014); FED. R. CIV. P. 8(d).  Relying on this principle, federal district courts in Alabama have declined to dismiss unjust enrichment claims where the plaintiff had also pleaded a breach of contract claim or alleged the existence of an express contract. *See Cajun Steamer Ventures, LLC. v. Thompson*, 402 F. Supp. 3d 1328, 1350 (N.D. Ala. 2019) ("Because this case is only at the motion to dismiss stage, [plaintiff] may plead both breach

of contract and unjust enrichment, even though ultimately it will only be able to recover under one category of relief."); *see also Carter v. Companion Life Ins. Co.*, 2019 WL 11637309, at *7 (N.D. Ala. Nov. 12, 2019) (concluding that the fact that plaintiff had alleged the existence of an express contract did not itself preclude him from simultaneously pursuing an "alternative, equitable claim for unjust enrichment"). The Court finds the analysis in *Cajun Steamer* and *Carter* persuasive and concludes that dismissal on the grounds urged by GM would be premature at the pleading stage. Consequently, the Court concludes that GM's motion to dismiss the Plaintiffs' unjust enrichment claim is due to be denied.

## VI.  CONCLUSION

For the reasons stated, and for good cause, it is hereby

ORDERED that GM's motion to dismiss (doc. 27) is GRANTED IN PART to the extent that Plaintiff Hurry's implied warranty claim, the Plaintiffs' express warranty claims (Count 2), and the Plaintiffs' ADTPA claims (Count 1) are DISMISSED, and DENIED in all other respects.

All other claims against GM remain pending.

Done this 22nd day of August, 2022.

       /s/ Emily C. Marks
EMILY C. MARKS
CHIEF UNITED STATES DISTRICT JUDGE